## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **THOMAS ALEXANDER ROSE,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:20cv00609** |
| | ) | |
| **v.** | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| **OFFICER ADAMS, et al.,** | ) | |
| **Defendants.** | ) | **By: Hon. Pamela Meade Sargent** |
| | ) | **United States Magistrate Judge** |

The pro se plaintiff, Thomas Alexander Rose, ("Rose"), who previously was incarcerated at River North Correctional Center, ("River North"), brings this civil rights action pursuant to 42 U.S.C. § 1983, against the defendants, Virginia Department of Corrections, ("VDOC"), Correctional Officers Adams, ("Adams"), and E. Paisely, ("Paisley"),[1] and Sgt. J. Robinson, a VDOC canine officer, ("Robinson"). In his Complaint, Rose alleges that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by using excessive force against him on August 7, 2020. (Docket Item No. 1, ("Complaint.")) In particular, Rose claims that he was the victim of an attack by another inmate; nonetheless, the defendants used excessive force against him. Specifically, Rose claims that Adams shot him in his back, Paisley used pepper spray against him, and Robinson allowed his canine to attack. Based on the consent of the parties, the case was transferred to the undersigned pursuant to 28 U.S.C. § 636(c). A bench trial was held on July 12, 2022. For the reasons discussed below, I will enter judgment in favor of the defendants.

---

[1] The Complaint and court's docket incorrectly spell the defendant's name as "Paisely" and "Pasely."

## I. Facts

At trial, Rose testified that he was a VDOC inmate housed at River North on August 7, 2020, when he was attacked by another inmate, Dodson. Rose said that he and Dodson were workout partners. Five minutes before Dodson attacked him, Rose said, Rose told Dodson that he needed to apologize to another inmate with whom he was involved in an altercation on August 5, 2020. Rose said he told Dodson that, if Dodson did not apologize, he would not continue to work out with him. Rose said that he was talking with another inmate when Dodson picked up a trash can and threw the trash can at him. Rose said that he took Dodson down and restrained him.

Rose said he then was shot in the back, so he slid with Dodson under "the cage." During this time, Rose claimed that he simply was restraining Dodson, but not fighting with him. Rose said that Paisley entered the pod and sprayed him with mace. Next, he said he felt a dog attack him. Rose said he then asked the canine officer to "get this damn dog off me." By this time, Rose said that Dodson had slid away from him. Rose said that the canine officer told him to turn over, which he did, and the canine officer removed the dog from him.

Rose testified that he knew that defendant Adams was the "gun man" in the Control Booth that day, but he admitted that he did not know who shot him in the back. Rose said that oleoresin capsicum, ("OC"), pepper spray came out of what hit him in the back. He said that Dodson continued to struggle with him as he held him and slid him toward the microwave. Rose said that there was no warning before he was shot in the back. He also said that he knew the officer in the Control Booth did not know who started the fight.

Rose said Paisley gave him no command or instruction before he sprayed him with mace in the face from two feet away. Rose said that he was not fighting with Dodson when he was sprayed, but, rather, simply was trying to restrain Dodson. Rose admitted that he still was on top of Dodson when the dog first bit him. He said that Dodson still was struggling when Sergeant Evans snatched Dodson out from under him. Rose said that, if the canine officer gave him any instructions, he did not hear him do so. Rose said that he could not see anything at this point because he had blood on his face and tears in his eyes. Rose said that when Robinson told him to turn over and get down, he did so, and Robinson disengaged with the dog.

Rose said that he suffered 40 to 50 lacerations from where the dog bit him, which had left him with scar tissue. "I was mauled," he said. A Nursing Assessment Of Offender Injuries form, dated August 7, 2020, was admitted into evidence as Plaintiff's Exhibit No. 1. (Docket Item No. 65-1.) The Assessment documented that Rose suffered numerous lacerations to the front and back of his right leg in the incident. Photographs of Rose's injuries were admitted into evidence as Plaintiff's Exhibit Nos. 2-5, 7. (Docket Item Nos. 65-2, 65-3, 65-4, 65-5, 65-7.) A photograph of Rose's bloody sock and shoe was admitted into evidence as Plaintiff's Exhibit No. 6. (Docket Item No. 65-6.)

Rose said that his wounds healed within a month and left scars on his leg. Until his wounds healed, he said that he had to wrap the wounds up when he showered. He said that, since the injury to his leg, the bottoms of his feet go numb, and his foot and leg swell. Rose said that, when he rubs the Achilles tendon area on his leg, it causes a sharp pain and tingling feeling. He said that he was prescribed Tylenol and Motrin for his pain. A copy of Rose's VDOC medical records were admitted into evidence as Plaintiff's Exhibit No. 8, (Docket Item No. 65-8).

Rose testified that he did not receive a disciplinary infraction over the events of August 7, 2020. He said that officers told him that, after reviewing the video recording of the incident, they determined that Dodson was the aggressor and not Rose.

On cross-examination, Rose stated that all inmates are given a book during orientation at River North, and that book instructs the inmate to get on the floor when a buzzer goes off. Rose said that, as an inmate, he knew that, whenever there is an altercation, you get down because you could be hit with a round. Rose agreed that, when the buzzer goes off, an inmate should not continue fighting. Nonetheless, Rose said, that, if you were in a fight, you had to protect yourself. Rose also conceded that an inmate was not supposed to restrain another inmate.

Rose said that Dodson was offended when he told him to apologize to the other inmate. Because of that, Rose said that he continued to watch Dodson as he walked away from him. Rose said that he kept Dodson in his peripheral vision because he did not know what he was going to do. Rose stated that, after Dodson threw the trash can at him, he tackled Dodson to the ground. Rose admitted that he knew that the gun man in the Control Room would shoot with any altercation. Rose also stated that he was a trained boxer.

Rose stated that he considered Dodson a friend, but he thought Dodson was mentally disturbed because Dodson previously had thrown his cellmate's television out of the cell.

Video recordings of the incident were admitted into evidence at Plaintiff's Exhibit No. 9. These video recordings were played for Rose's review during his

cross-examination. Based on his review of the recording, Rose admitted that the video showed that Dodson picked up a trash can and threw it at him at 1:30:11 p.m. At 1:30:12, Dodson came toward Rose with his hands closed, and at 1:30:13, Rose tackled Dodson to the floor. Rose said that he still was holding Dodson when he was hit in the back by the OC round at 1:30:26 on the video. He admitted that he did not release Dodson when he was hit by the round, but, rather, he drove Dodson underneath the microwave table at 1:30:31 on the recording. Rose said that he drove Dodson under the microwave table to "get[] out of the line of fire." Rose said that he knew that "whenever two guys lock up, you are going to get shot if you don't get out of the way." Rose admitted that he did not release Dodson and simply walk away. Instead, he said that he was waiting on staff to come "break us up to separate us." Rose testified that no one told him to stop fighting. He testified, "I never struck Mr. Dodson at all. I was just holding him and restraining him."

Rose said, "…I did not hear the buzzer because I was in the mix." Rose said he did not hear any orders when the officers entered the pod. Rose admitted that he did not disengage with Dodson after being hit with the OC round, nor did he disengage with Dodson even when Paisley used mace on him at 1:30:32 on the video recording. In fact, Rose admitted that, when he was maced, he grabbed Dodson even tighter because he put his face into Dodson's chest. Rose agreed that he continued to grip Dodson when the canine came into the unit and bit him on his right leg at 1:30:43 on the video. Rose said that Sgt. Evans actually drug Dodson out from under him. Rose said he then raised up and turned over and asked the officer to get the dog off of him. He said the officer gave him a command to turn over, open his hands and lie on the floor, which he did at 1:31:11 on the video. The officer then commanded the dog to release him, and it did at 1:31:17 on the video.

The medical records contained in Plaintiff's Exhibit No. 8 show that H. Walls, L.P.N., treated Rose on August 7, 2020, for multiple dog bites to his right leg. (Docket Item No. 65-8 at 7.) Walls cleaned the area, applied Neosporin and dressed Rose's wounds. Walls noted that Rose's tetanus vaccination was up-to-date and that Rose was decontaminated after the use of chemical spray. Rose was instructed to keep his wounds clean and dry, to change his wound dressing daily for the next seven days and to return to Medical if his condition worsened. Rose was prescribed Augmentin, Tylenol and Bacitracin ointment. He was referred to see a doctor.

Rose was seen by another nurse[2] later that same day, complaining that his bandage needed changing. (Docket Item No. 65-8 at 8.) The nurse observed a large amount of blood on Rose's bandages, which had been loosened. The area of Rose's wounds was cleaned, and a pressure dressing was applied. Rose was instructed not to remove this dressing and to notify medical staff if there was any increase in bleeding. He also was instructed to avoid weight bearing on his leg, if possible, until he saw the doctor.

The medical records reflect that, on August 8, 2020, an order was entered to send Rose out to a hospital emergency department for evaluation. When Rose was brought to Medical to transport to the hospital, Rose refused to go. The nurse changed his dressing, noting that a puncture wound to Rose's posterior calf continued to "pulse small amounts of blood." (Docket Item No. 65-8 at 8.)

Dr. Mathena saw Rose on August 10, 2020, in follow-up to the dog bites to his right leg and complaints for left facial pain. (Docket Item No. 65-8 at 6.) Dr.

---

[2] The nurse's signature is not legible.

Mathena noted that the bleeding from Rose's leg wounds had stopped. Some swelling was noted in Rose's left orbital and nose area without any bleeding or bruising. Dr. Mathena noted that Rose's dog bites were healing well, and he diagnosed a left facial contusion. He added a prescription for ibuprofen. He also ordered an x-ray of Rose's facial bones. (Docket Item No. 65-8 at 5.)

When Rose received wound care on August 14, 2020, the nurse notified the doctor that a laceration on Rose's right outer calf was red with "yellow slough." (Docket Item No. 65-8 at 5.) Rose was seen by Dr. Mathena in follow-up for his dog bites on August 21, 2020, and he complained of swelling, pain and soreness in his right lower leg and foot, but stated, overall, he was doing better. Dr. Mathena noted a small amount of yellow drainage, with open wounds and no sign of abscesses. Dr. Mathena ordered continued daily dressing changes, prescriptions for Augmentin and ibuprofen and instructed Rose to elevate his right leg.

Dr. Mathena saw Rose again in follow-up for his dog bites on September 8, 2020, and noted that his right leg lacerations were slowly healing. (Docket Item No. 65-8 at 3.) He noted no drainage, but some swelling of the right lower leg. Rose also complained of some pain around his left eye. Dr. Mathena ordered a support stocking for the swelling in Rose's leg and x-rays of Rose's right lower leg and left facial area. (Docket Item No. 65-8 at 2.)  Those x-rays were performed on September 14, 2020, but the records do not contain the results.

Rose testified that he continued to experience numbness in his feet. He said he had been seen by a specialist, and a CT scan and myelogram had been performed.

VDOC Inmate John Edward Hill, ("Hill"), also testified at trial that he witnessed an unknown "white dude" who "was crazy in the head" attack Rose, who he knew as "Shabazz," on August 7, 2020. Hill said that he saw this man punch Rose in the face and just keep punching him. Hill said he saw the canine officer come into the pod and put the canine's mouth on Rose's leg. Hill said that Rose never threw a punch and was only trying to restrain his attacker when the officer sicced the canine on him. Hill said he heard shots being fired from the Control Booth at one point, but he could not recall any verbal warnings. Hill said he was inside his top tier cell looking out through the cell door window when he witnessed these events. Hill also stated that he heard something which alerted him to look out his cell door window to see what was happening. Whether he heard the shots being fired or the alarm, he was not sure. Hill admitted, however, that he was not looking out the door until he heard this noise. Hill also stated that he could "hear everything" because he had hearing aides despite being in his cell.

Hill did confirm that the other inmates in the pod area scattered and got down on the ground. He said that inmates are instructed to lie down on the floor whenever there is a shot or an alarm goes off. Hill said that he heard Rose tell the canine officer, "Get the dog off me." Nonetheless, Hill said the canine officer just "let the dog chew him up." On cross-examination, Hill did admit that Rose and Dodson still were fighting when the canine was deployed on Rose. Hill also testified that, after the officers got Rose up to put restraints on him, the canine officer pushed the dog onto Rose's leg to bite him again.

VDOC inmate Keith Lorenzo Fitzgerald, ("Fitzgerald"), also testified at trial that he was standing at a table about 15 feet away when he saw Rose's workout partner try to hit Rose with a garbage can on August 7, 2020. Fitzgerald stated that

he did not see Rose throw any punches, but, rather, Rose was just trying to hold the other inmate down. Fitzgerald said that the incident occurred while inmates in the C-2 Pod were outside of their cells for pod recreation. Fitzgerald said that he heard an order for the inmates to get down and stay down.  Specifically, he testified that the Control Booth gave a warning to the inmates to "get on the floor."  Fitzgerald said he did not hear an alarm or a buzzer, but the inmates know to get down when a fight breaks out. He said that the fight had been going on for a couple of minutes before the canine officer entered the pod. He admitted that Rose and Dodson were continuing to struggle after the order was given for everyone to get down on the floor. He said that he remembered shots being fired, which hit Rose because Rose was on top of Dodson. He said that Rose slid Dodson across a red line area, up under a microwave.

Fitzgerald said that, as correctional officers entered the pod that day, they were yelling for the inmates to get down. Fitzgerald said that he heard the canine officer tell Rose to stop moving. He said he also saw the canine officer pick up his canine and throw it on top of Rose. He said the dog then started biting Rose. He also said that he heard Rose tell the canine officer to "get the dog off me, man."

VDOC inmate Robert Lee Jones, ("Jones"), testified that he saw another inmate throw a trash can at Rose on August 7, 2020. Jones said that he saw Rose jump through the air and hit the ground. He said the officer in the Control Booth then started shooting at Rose. Jones said that Rose was not hitting the other inmate, but he was just trying to get out of the way. Jones said that the canine officer entered the pod and threw his canine on Rose. He said Rose was on the ground, and he heard Rose say, "Get the dog off me. Get the dog off me."

Jones testified that he saw Rose slam the other inmate to the floor, but he said that he never saw Rose strike or hit the other inmate. After Rose slammed the other offender to the floor, Jones said, Rose was on top of the other inmate and trying to scoot the inmate across the floor to get out of the way of the bullets. Jones said he heard the canine officer tell Rose to "turn over, turn over" while the canine was engaged and biting Rose.

At another point, Jones said that he did not pay any attention to what was occurring until he heard the thrown trash can land on the floor. He said that when he looked, he saw Rose throw the other inmate in the air and land on top of him on the floor. Jones said that he saw the rubber bullets that were being fired land on the pod floor. Jones said that he did not remember any officer giving any verbal warnings before shooting, but he did remember the buzzer going off. When the buzzer was sounded, Jones said he got down on the floor to show that he was not putting up any resistance. He said that, as the correctional officers entered the pod, they were saying to lie down or to get down on the floor. Jones admitted that VDOC inmates are instructed to lie down on their stomachs on the floor when a fight breaks out.

VDOC inmate Askari Lumumba, ("Lumumba"), also testified at trial that he saw another inmate throw a trash can at Rose on August 7, 2020. Lumumba said that he then saw the other inmate try to take a swing at Rose, and Rose took the other inmate to the floor. Lumumba said that he heard a gunshot just before he saw correctional officers enter the pod. He said he did not hear any verbal warning or buzzer before the gunshot. Lumumba testified that, as correctional officers began entering the pod, they were telling the inmates to get on the ground. Regardless, he said that VDOC inmates know to get down to show that they are not being disruptive when shots are fired.

Lumumba said the first officer into the pod sprayed Rose with mace, and another officer pulled the other inmate out from underneath Rose. Lumumba said that the canine officer took the dog by its collar and then threw it on Rose, and the canine mauled Rose for at least two minutes. Lumumba said that he heard Rose yell for the officer to get the dog off of him, and the officer told Rose to turn over. Lumumba said that Rose then turned over, and the canine officer took the canine off of Rose. He said that he did not see Rose hit the other inmate.

Lumumba stated that he was Rose's cellmate at the time of this incident. He said that when Rose returned from the Medical Department that day, his leg was bloody and swollen from all the lacerations. He said that Rose removed his bandages from his leg when he returned to the cell to show Lumumba his injuries.

Defendant and former River North Correctional Officer, Ethan Ray Paisley, ("Paisley"), testified that it was within the VDOC's use of force protocol to use OC spray on an offender to get the offender to comply with orders. Paisley stated that, when he entered the C-2 Pod on August 7, 2020, he started spraying OC spray when he was approximately six feet away. Paisley said that he sprayed four bursts of OC spray. He said the first two missed the target area, the third hit Rose in the face, and the fourth hit Dodson in the face. He said that he was trained to respray if he initially missed the target area. Paisley said that he gave three orders to the inmates to stop fighting, and they did not disengage. He said he stepped aside when Robinson, the canine officer, came in behind him.

Paisley said that he heard Robinson warn the inmates to stop fighting or he would engage the canine. He said the inmates did not stop fighting. He said the inmates were inside a red line area near the pod microwave. He said there were two

inmates who were microwave attendants in that pod, and only those two inmates were allowed in the area beyond the red line to use the microwave. Paisley said that inmates were required to take their food to the microwave attendants to use the microwave.

Paisley said that, when he entered the pod, the inmates were wrestling, and Rose was holding Dodson down. Paisley said it appeared to him as if Rose was trying to put Dodson in a choke hold. Paisley said he saw two inmates "wrestling. Ya'll were struggling." He said that officers were not allowed to get between two fighting inmates, and, instead, would deploy the canine to break up fighting inmates. Paisley said that, when the canine attacked Rose, Rose released Dodson. Dodson raised up, Paisley ordered him to lie on the floor, and Dodson complied.

Defendant and River North Correctional Officer, Jordan Mark Adams, ("Adams"), testified that he had been employed at River North about a year before this incident occurred. Adams said, on August 7, 2020, he was working the gun post in the Control Room when he saw Dodson throw a trash can at Rose, and Rose then tackled Dodson. Jones said, "I just seen two inmates wrestling on the ground. I seen punches throwed, but I don't know who threw what." Jones said that he stepped to the window and gave the inmates a verbal warning to stop fighting and get on the ground. He said he also activated an audible alarm, but Rose and Dodson did not stop fighting. Jones said he then fired one shot with an OC round. The foam OC round hit Rose in the lower back and deployed OC powder. Jones said that he turned to retrieve a multi-shot firearm containing foam rounds, when the inmates dove under the microwave, and he could not shoot at them any longer. He said that the icebox cage was between him and the inmates at that point. Adams said, as other correctional officers entered the pod, he turned his attention to the other inmates to

make sure they all were down on the floor. Adams specifically denied that the prison used "rubber" bullets. He also denied firing any foam rounds at the inmates other than the one OC round.

In reviewing the video recording of the incident with Adams, Adams said that the recording showed Dodson pick up the trash can and throw it at Rose at 1:30:11. He said that the video then showed the two throwing punches at each other, but he could not tell who was punching whom. Adams then said that the video appeared to show the inmate on top punching down. Adams said that the video showed the cloud of OC spray from the round he shot at 1:30:24. He said the purpose of the OC round was to get the inmates to stop fighting. He said that when he fires an OC round, his target is the inmate's lower extremities.

Adams said that he had no other issue with Rose, either before or after this incident. Adams said, a few days after this incident, Rose told him that he was going to sue him because he needed a little money before he went home.

Defendant and River North Sergeant, Joshua Aaron Robinson, ("Robinson"), testified that he was working with his German Shepherd "Tom" on August 7, 2020, when he responded to the altercation in the C-2 Pod involving Rose. Robinson said, when he entered the pod, Rose was on top of Dodson, and "My perception [was] … you were on top striking him." "There was a lot of motion, and you were on top of him" Robinson said, when he entered the pod, Sergeant Evans directed him toward the fighting inmates. He said, as soon as he entered the pod, he started giving the command, "State canine. Stop fighting or I will use the dog."

Robinson said that when he deploys his dog, he simply gives the dog enough leash to reach the fighting inmates. He said the dog then chooses who he engages. Robinson said that, as he approached the fighting inmates, he simply released the slack in his dog's leash. Robinson said, when he deployed the canine, Rose rolled up toward him, and Dodson rolled out from under Rose. He said that Rose asked him to take the dog off him. Robinson said that Rose was not being compliant at that point, because he was supposed to lie face down. Robinson said that he told Rose to turn over on his belly with his palms out. He said that Rose complied, and he gave his dog the order to disengage, which it did. Robinson said that inmates were instructed to lie down face first to put them in a compliant position.

Robinson testified that, a couple of months after this incident, he spoke with Rose and told him that he wished the incident had not happened. Robinson said that no one likes to use force, and it was sad that force had to be used in this incident. Robinson testified, however, that he thought the use of force was necessary in this incident. Robinson said that, when he entered the pod, all he could tell was there was one inmate on top of another, and there was a lot of movement.

Robinson said that he and his dog were patrolling outside the C-1 Pod when he heard the buzzer sound. He said he then headed in the direction of the sound of the buzzer when he heard someone call on the radio that there was an inmate fight in the C-2 Pod. He said that it took him less than one minute to respond to the scene of the fight. When he entered the pod, Robinson said that he heard the audible alarm, he could smell OC spray, and he saw a spent OC round had been shot.

Robinson said that Tom weighed 105 pounds. He specifically denied that he threw the dog or put the dog on Rose. Robinson said that he gave the dog more leash,

and the dog responded toward aggression. Robinson said that, after the dog disengaged, he told the staff that the dog had bit Rose and that Rose needed medical attention. He said the photographs of Rose's injuries were consistent with the use of the canine on him. He said that his dog is trained to bite and hold on until given the command to let go. He said that, if his dog lost its bite, it would bite again until given the order to let go.

In reviewing the video recording of the incident, Robinson said the video showed that he and his dog entered the pod at 1:30:41. By 1:30:49, the dog is engaged with Rose. The dog was disengaged with Rose by 1:31:06. Robinson said, from beginning to end, his dog was engaged with Rose about 20 seconds.

River North Institutional Investigator, Edmond Ellroy Earhart, ("Earhart"), testified that when any incident involving a use of force occurs at a VDOC correctional facility, the officers involved complete Internal Incident Reports that are used to compile an Incident Report. In this case, Earhart said, the Incident Report was completed by Lt. Lowe. This Incident Report was admitted into evidence as Defense Exhibit No. 1, (Docket Item No. 65-17).

The Incident Report listed the offenders involved in the incident as Larry W. Dodson and Thomas A. Rose, and it listed the staff involved as Correctional Officer Adams, Correctional Officer Jared Boyington, Charles T. Burnette, Sgt. Larry D. Evans, Correctional Officer Austin Haga, Ethan R. Paisley, Patrol Canine Sergeant Joshua Robinson, Correctional Officer Davy L. Taylor, Becky A. Thompson and Kaci A. Waller. Under the "Type of Incident" section, it states "Discharge of a less lethal weapon" and "Use of force; including physical force, electronic devices,

chemical agents, canines…." Under the "Use of Force" section, it lists chemical agents and use of canines. Under the "Description of Incident" section, it states:

> … On August 7, 2020[,] at approximately 1:30 PM, offenders L. Dodson … and T. Rose … became engaged in a physical altercation in the dayroom of C2. One OC round from the 40 mm Single Launcher, four bursts of OC from a MK-4 and canine engagement were utilized to quell the altercation. Offender Dodson received treatment for minor injuries, including a human bite. Offender Rose received treatment for moderate injuries including a canine bite. No injuries to staff.

> … On August 7, 2020[,] at approximately 1:30 PM, C building gun post Officer J. Adams observed offender L. Dodson … throw a trash can at offender T. Rose … in the dayroom of C2. Both offenders then engaged in a physical altercation. Officer Adams activated the audible alarm and issued a verbal warning for the offenders to stop fighting. When neither offender complied, Officer Adams fired one Oleoresin Capsicum (OC) round from the 40mm Single Launcher, hitting offender Rose.

> At this time, Officer E. Paisley entered C2 and instructed the offenders to stop fighting, they continued to fight. Officer Paisley then administered two (2) ½- 1 second bursts of O/C from his MK-4, failing to hit the target area of either offender. A third ½ - 1 second burst of OC hit offender Rose in the target area and a fourth ½ - 1 second burst of OC hit offender Dodson in the target area. Both offenders continued to fight.

> At this time, K-9 Sergeant J. Robinson entered C2 with his assigned canine Tom …, issuing verbal commands to both offenders to stop fighting. When the offenders failed to comply, canine Tom engaged on offender Rose, biting him in the lower right leg. At this time, both offenders ceased fighting.

> Offender Dodson was restrained and escorted to medical by Sergeant L. Evans and Sergeant C. Burnette. Open air decontamination began when the offender was removed from the area. Once in medical, offender Dodson was treated for minor injuries including a human bite on his left bicep. After being treated, offender Dodson was then

escorted to A2 Restrictive Housing Unit and further decontamination
was offered but offender Dodson refused.

Offender Rose was restrained and escorted to medical by Officer J.
Boyington and Officer A. Haga. Open air decontamination began when
the offender was removed from the area. Once in medical, offender
Rose was treated for moderate injuries including a canine bite to his
lower right leg. After being treated, offender Rose was returned to C
Building and offered further decontamination but he refused.

All notifications made. No injuries to staff reported.

(Docket Item No. 65-17 at 1-2.)

Earhart testified that he had no bad rapport with Rose. Earhart testified that he
was Watch Commander on the date of this incident. As Watch Commander, he said
he approved Rose to be transported to a local hospital for medical treatment. Earhart
said, when he told Rose he would have to quarantine for two weeks upon his return
to River North, Rose refused the transport for treatment.

Kaci Waller, R.N., River North Nursing Supervisor, ("Waller"), testified that
she provided medical care to Dodson on August 7, 2020. Waller said that she
observed a human bite on Dodson's left upper inner bicep. She said that Dodson told
her he was bit in the fight, and she could tell it was a human bite based on the shape
of the indentations in Dodson's arm. Waller said the bite mark appeared to be recent,
and it had broken Dodson's skin. A photograph of this bite injury to Dodson's arm
was admitted into evidence as Defense Exhibit No. 2, (Docket Item No. 65-18).

Waller also testified that Rose's VDOC medical records showed that he was
treated on August 7, 2020, for multiple dog bite wounds. According to the records,

Rose's wounds were cleaned, and antibiotic ointment and dressing were applied to the wounds. Waller said the records did not indicate that Rose suffered any adverse reaction to the use of OC spray or any injury from being hit by the projectile. Waller said the records show that Rose returned later that same day because he had loosened his bandages, and they needed changing. On August 8, 2020, the records reflect that Rose's puncture wounds continued to bleed. It was recommended that Rose be taken to a hospital emergency department for treatment, but Rose refused. Waller said a new dressing was applied.

Waller testified that the records show that Rose was examined again on August 10, 2020, for the injuries to his right leg and complaints regarding the area around his left eye and cheek. The records show that, upon neurological examination, Rose's sensation was grossly intact, he had a normal gait and normal strength in all extremities. He was given a seven- to 10-day course of antibiotics. Rose next sought treatment for his injuries on August 14, 2020. The examination on that day showed that his wounds were red with yellow slough, which Waller said indicated that his wounds were struggling to heal. An examination on August 21, 2020, revealed that Rose's wounds had started to heal. Rose's dressing was changed; he was continued on antibiotics, and he was instructed to elevate his leg to combat swelling.

On September 8, 2020, an examination of Rose's wounds showed that they were slowly healing with no drainage or other signs of infection. Some slight swelling was noted. X-rays and a venous ultrasound were ordered of Rose's leg. The x-rays were normal. Waller said that Rose received no additional treatment for his injuries while at River North. Waller stated that Rose's medical records showed that an intake assessment was performed on September 29, 2021, upon his transfer to

Buckingham Correctional Center. Upon intake, Rose's only complaint was dental pain. He did not complain of any leg pain, and he ambulated without difficulty.

Waller said that the records showed that, on March 3, 2022, Rose did complain of chronic right lower extremity discomfort due to his dog bite injury. An examination showed well-healed scars, his neurological function was intact, and he ambulated without difficulty. Waller said that the records showed no objective signs of any loss of function in Rose's right leg.

Waller stated that, based on her review of Rose's medical records, he was not compliant with the instructions of the medical staff for the first two weeks after he sustained his dog bite injuries. In particular, she said that the records reflected that Rose had loosened his wound dressings on two occasions. Waller said that, with pressure bandages being applied to stop bleeding, it would not have been recommended that Rose remove the bandages to clean his wounds. She also stated that notes that Rose's right lower leg was swelling showed that he was failing to keep his leg elevated as he was instructed.

On cross-examination, Waller admitted that she did not specialize in treatment for dog bite wounds. Waller also stated that on September 21, 2020, a medical order was written for oversized cuffs with a larger circumference to be used on Rose's legs due to swelling in his right lower leg. This medical order was admitted into evidence as Plaintiff's Exhibit No. 17. (Docket Item No. 65-16.)

The Internal Incident Report completed by Defendant Adams was entered into evidence as Plaintiff's Exhibit No. 10, (Docket Item No. 65-9). On this Report, Adams wrote:

On 08/07/2020, I C/O Adams was on Charlie building gun post. At approximately 1:29 pm, I witnessed offender Dodson … throw a trash can at offender Rose … during pod rec in Charlie 2 pod. At this time the two offenders began fighting. I gave a verbal warning for the offenders to stop fighting, there was no compliance. I then gave an audible warning, there was still no compliance. I then fired one OC round at the offenders striking offender Rose. After the shot multiple officers and K9 came into the pod and contained the fight.

(Docket Item No. 65-9 at 1.)

The Internal Incident Report completed by Defendant Paisley was entered into evidence as Plaintiff's Exhibit No. 11, (Docket Item 65-10). On this Report, Paisley wrote:

On 08/07/2020 at approximately 01:30 PM, I, Officer Paisley, responded to a fight called in C-2. Upon entering C-2 I observed two offenders fighting under the pod microwave. I utilized my O.C. canister using 4 half-second bursts of spray. I was unable to hit the target area with my first two bursts. My third burst hit the target area of Offender Dodson …, my next burst hit the target area of Offender Rose…. K-9 entered the pod and quelled the altercation.

(Docket Item No. 65-10 at 1.)

The Internal Incident Report completed by Defendant Robinson was entered into evidence as Plaintiff's Exhibit No. 12, (Docket Item No. 65-11). On this Report, Robinson wrote:

On August 7th 2020 at approximately 1:30 pm, I Canine Sergeant J. Robinson with my assigned canine Tom … was patrolling the

-20-

boulevard during outside recreation when C control called for canine assistance in C 2 via security radio. I Canine Sergeant J. Robinson immediately responded to C 2, upon entering the building I began issuing several verbal warnings of "State Canine, stop fighting or I will use the dog". I then entered the pod, I observed the audible alarm being utilized and shots had been fired. I was then directed to the ice machine area by Sergeant Evans where I observed Offender T. Rose … on top of Offender L. Dodson… striking him, I then gave one more warning of "State Canine, stop fighting or I will use the dog". Offender Rose … continued to strike Offender L. Dodson …. I then gave my assigned canine Tom … the command to engage. Tom immediately engaged Offender T. Rose … on the lower right leg. I then instructed Offender T. Rose … to lay down on his stomach and to put his arms out to the side with his palms up. At this time Offender T. Rose … complied. I then gave my assigned canine Tom … the command to disengage and he did so immediately. I then instructed responding staff to escort Offender T. Rose … to medical to be assessed by medical staff. I then remained in the pod to support responding staff in Offender searches and remained in the pod till [sic] all Offenders were locked down. I was relieved by Canine Officer M. Garcia and I immediately exited the facility. No injuries to myself or my assigned canine.

(Docket Item No. 65-11 at 1.)

The Internal Incident Report completed by Larry D. Evans was entered into evidence as Plaintiff's Exhibit No. 13, (Docket Item No. 65-12). On this Report, Evans wrote: "Offender Dodson … threw a trash can at another offender resulting in a fight in C2. Therefore offender Dodson is being referred to RHU." (Docket Item No. 65-12 at 1.)

The Internal Incident Report completed by Heather M. Walls, L.P.N., was entered into evidence as Plaintiff's Exhibit No. 14, (Docket Item No. 65-13). On this Report, Walls wrote:

At approximately 1:30 pm, Offender T. Rose … was brought to medical after an altercation with another offender and dog bites. Vital signs stable. Alert and oriented x 4. Right leg with wounds as follows: Laceration 1 cm x 2 cm below right knee. Multiple superficial lacerations, Laceration 2 cm x 2 cm to back of right leg. Laceration 1 cm x 1 cm behind right knee. Laceration 1 cm x 2 cm above right heel. No active bleeding at present. All wounds cleansed with Hibiclens, Neosporin, and Dressings applied. Dr. Mathena made aware and additional orders given. Offender decontaminated after chemical spray used. No acute distress noted. Offender to notify medical with any issues. Verbalized understanding.

(Docket Item No. 65-13 at 1.)

The Internal Incident Report completed by Waller was entered into evidence as Plaintiff's Exhibit No. 15, (Docket Item No. 65-14). On this Report, Waller wrote:

On August 7th, 2020 at approximately 1:45 pm, offender Dodson, Larry … was brought to medical for assessment. I, Nurse Waller, and Nurse Thompson assessed offender. Offender was in a physical altercation and was bit by offender. Bite noted to left upper, inner arm approximately three inches wide and two inches long. Wound was open. Wound cleansed with wound cleanser, antibiotic ointment applied, and non stick dressing applied. Tdap administered. Offender denies any other injury or abuse. Dr. Mathena notified. Educated offender on signs and symptoms of infection.

(Docket Item No. 65-14 at 1.)

A K9 Bite Log Report, dated August 7, 2020, was entered into evidence as Plaintiff's Exhibit No. 16, (Docket Item No. 65-15). This Report noted that the canine Tom had a valid rabies tag through April 22, 2022. The Report noted that Tom bit Rose on August 7, 2020, at River North. The "Bite Narrative" section of the Report states:

On August 7th 2020 at approximately 1:30 pm, I Canine Sergeant J. Robinson with my assigned canine Tom … was patrolling the boulevard during outside recreation when C control called for canine assistance in C 2 via security radio, I Canine Sergeant J. Robinson immediately responded to C 2, upon entering the building I began issuing several verbal warnings of "State Canine, stop fighting or I will use the dog". I then entered the pod, I observed the audible alarm being utilized and shots had been fired. I was then directed to the ice machine area by Sergeant Evans where I observed Offender T. Rose … on top of Offender L. Dodson ... striking him, I then gave one more warning of "State Canine, stop fighting or I will use the dog". Offender T. Rose … continued to strike Offender L. Dodson …, I then gave my assigned canine Tom … the command to engage, Tom immediately engaged Offender T. Rose … on the lower right leg. I then instructed Offender T. Rose … to lay down on his stomach and to put his arms out to the side with his palms up. At this time Offender T. Rose … complied, I then gave my assigned canine Tom … the command to disengage and he did so immediately. I then instructed responding staff to escort Offender T. Rose … to medical to be assessed by medical staff. I then remained in the pod to support responding staff in Offender searches and remained in the pod till [sic] all offenders were locked down. I was relieved by Canine Officer M. Garcia and I immediately exited the facility. No injuries to myself or my assigned canine.

(Docket Item No. 65-15 at 1-2.)

A DVD containing video recordings of the incident from five different C2 Pod surveillance cameras was admitted into evidence as Plaintiff's Exhibit No. 9. Of these five recordings, the recording RNCC 205 C2 Pod Front Right provides the best view of the events at issue. This recording shows that at 1:30:12 p.m., Dodson picked up a trash can and threw it at Rose. Rose immediately runs toward Dodson, picks him up and drives him down on the concrete floor at 1:30:15 p.m. Rose is on top of Dodson as the two men continue to struggle, and it appears that Rose's right arm

moves back and forth as if he is striking Dodson. At 1:30:23 p.m., a cloud can be seen dispersing over the two men, who continue to struggle with Rose on top. With Rose remaining on top, the two men slid toward the far wall of the pod. At 1:30:32 p.m., two officers approach Rose and Dodson. The men continue to struggle, and Robinson, with his canine, approach the men at 1:30:44 p.m. At 1:30:51, Dodson breaks free from Rose and lies down to be restrained. At 1:31:09 p.m., Rose lies down flat on his stomach. By 1:31:14, the canine has disengaged Rose, and Robinson moves away from Rose with the canine. Based on the video recording, the entire incident lasted one minute and six seconds. At 1:32:18, officers bring Rose to his feet, restrain him and escort him out of the pod.

## *II. Analysis*

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects prison inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian,* 503 U.S. 1, 5 (1992); *Whitley v. Albers,* 475 U.S. 312, 319 (1986).

The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams,* 77 F.3d at 761 (citing *Wilson v. Seiter,* 501 U.S. 294, 302 (1991)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson,* 503 U.S. at 9 (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d

Cir. 1973)). To meet the objective component in an excessive force case, an inmate must show that the force used was "nontrivial," *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), given that "contemporary standards of decency always are violated… whether or not significant injury is evident." *Hudson,* 503 U.S. at 9. "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins,* 559 U.S. at 37 (quoting *Hudson,* 503 U.S. at 7). In fact, the extent of the injury may suggest that "'the use of force could plausibly have been thought necessary' in a particular situation" or "provide some indication of the amount of force applied." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins,* 559 U.S. at 38 (quoting *Johnson*, 481 F.2d at 1033). As *Wilkins* clarified, it is the nature of the force "that ultimately counts" and provides the "core judicial inquiry" in an excessive force case. 559 U.S. at 37, 38. In particular, courts must consider "whether [the force] was nontrivial and 'was applied…maliciously and sadistically to cause harm.'" *Wilkins*, 559 U.S. at 39 (quoting *Hudson*, 503 U.S. at 7).

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1)      The need for application of force,

2)     The relationship between that need and the amount of force used,

3)     The threat "reasonably perceived by the responsible officials," and

4)     "any efforts made to temper the severity of a forceful response."

*Williams,* 77 F.3d at 762 (citing *Whitley,* 475 U.S. at 321).

After hearing the evidence in this case, I will find in favor of the defendants on Rose's § 1983 claim because I find that the preponderance of the evidence shows that the force applied by Adams, Paisley and Robinson was not excessive, in that it was done in a good-faith effort to restore order. While it is clear that Rose was not the initial aggressor, the evidence before the court showed that after Dodson threw the trash can, Rose picked Dodson up, threw him to the concrete floor and appeared to be striking Dodson. From the evidence before the court, I find that Rose was on top of Dodson and continuing to struggle with Dodson when Adams used force by deploying one OC canister round striking Rose in the back, when Paisley sprayed Rose with one burst of OC spray and when Robinson deployed his canine on Rose. All three defendants testified that they warned the men to stop fighting before each use of force. The video evidence supports the officers' testimony as to a warning being given because it shows other inmates dropping to the ground and lying there. The video evidence and the officers' testimony establish that each use of force was measured, in an attempt to stop the altercation. Also, the video evidence shows that, as soon as Rose complied with orders, the force stopped, in that Robinson disengaged the canine.  I further note that the video evidence clearly discredits the testimony of inmates Hill, Fitzgerald, Jones and Lumumba that Robinson threw the dog onto Rose.

An appropriate Final Order and Judgment will be entered finding in favor of the defendants and striking this case from the docket.

## FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now makes the following formal findings and conclusions:

1.    The preponderance of the evidence shows that Adams, Paisley and Robinson all gave Rose verbal warnings to quit fighting and to lie on the ground before using force on him on August 7, 2020; and

2.    The preponderance of the evidence shows that the force used by Adams, Paisley and Robinson on Rose on August 7, 2020, was not excessive, in that it was not applied maliciously or sadistically but, rather, in a good-faith effort to restore order.

The Clerk is directed to send copies of this Findings Of Fact And Conclusions Of Law to all counsel of record and unrepresented parties. The court will enter an appropriate Final Order and Judgment.

**ENTERED**: December 16, 2022.

/s/    *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE